# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CHAREE STANLEY,

       Plaintiff,                 Case No. 16-cv-12884

                                           Paul D. Borman
v.                                    United States District Judge

EXPRESSJET AIRLINES, INC.,

       Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 33)

In this religious discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII") and its Michigan counterpart the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*, ("the ELCRA"), Plaintiff, a Muslim woman who was employed as a flight attendant for Defendant ExpressJet Airlines, Inc. ("ExpressJet"), alleges that she was discriminated against on the basis of her religion when Defendant refused to accommodate her religiously held belief that prevents her from ever serving alcohol to passengers. Plaintiff further alleges that Defendant retaliated against her by rescinding a previously-granted accommodation and placing Plaintiff on administrative leave pending termination.

In an Opinion and Order issued on June 7, 2017, this Court denied ExpressJet's motion to dismiss because the motion relied on matters outside the pleadings. *Stanley v. ExpressJet Airlines, Inc.*, No. 16-cv-12884, 2017 WL 2462487 (E.D. Mich. June 7, 2017). Now before the Court is ExpressJet's Motion for Summary Judgment (ECF No. 33). Plaintiff has filed a Response (ECF No. 36) and ExpressJet has filed a Reply (ECF No.37). The Court held a hearing on November 6, 2018. For the reasons that follow, ExpressJet's motion is GRANTED.

## I. FACTUAL BACKGROUND

### A. Plaintiff's Employment and Termination From Express Jet

Plaintiff began working as a flight attendant for Express Jet on January 31, 2013. (ECF No. 33, Def.'s Mot. Summ. J. Ex. C, January 29, 2018 Deposition of Charee Stanley 56:8-12; Def.'s Mot. Ex. B, May 30, 2018 Declaration of Daniel J. Curtin ¶ 4.) As an Express Jet Flight Attendant, Plaintiff was a member of the International Association of Machinists and Aerospace Workers ("the IAM" or "the Union"), and a Collective Bargaining Agreement ("CBA") governed the relationship between Express Jet and its Flight Attendants. (Def.'s Mot. Summ. J. Ex. A, ASA-AFA 2008 CBA.) Plaintiff was a practicing Christian when she began the interview process for the job with Express Jet, but during the interview process in mid-December, 2012, she met "a young gentleman who talked about Emirates" and

2

expressed the view that if he was to live abroad, he would work for Emirates. (Stanley Dep. 24:9-21, 51:5.) Plaintiff became curious about the possibility of living abroad and working for Emirates and "went home and looked it up." (Stanley Dep. 24:20-24.) She learned that she could "live in Dubai, and [] work overseas, and [] make tax-free money, and [] could travel the world." (Stanley Dep. 24:23-25:1.) Plaintiff researched Emirates and applied for a job with them and "knew that Dubai was a Muslim country but didn't know what that meant." (Stanley Dep. 25:1-4.) Plaintiff began to research the Muslim faith and "fell in love with it" and took her "shahada," or "confession of faith," on January 2 (or 3), 2013. (Stanley Dep. 25:4-7, 51:4.) So Plaintiff was not a practicing Muslim when she interviewed for the job with Express Jet but once she started her training on January 21, 2013, she had converted to the Muslim faith. (Stanley Dep. 25:11-14, 51:3-5.)

During her training, Plaintiff made a request of one of her trainers to be permitted to wear her hijab (head scarf). (Stanley Dep. 65:14-22,67:6.) That verbal request was initially declined but Plaintiff submitted a written a request shortly thereafter, on or about August 26, 2013, which was granted by Express Jet. (Stanley Dep. 66:3-20, 70:8-71:6, 75:1-16; ECF No. 33-6, Stanley Dep. Attach. 9, PgID 1153.)

Plaintiff understood that serving beverages was part of her job responsibilities and she understood that alcohol was one of the beverages that was available to

passengers to request as part of that beverage service on Express Jet flights. (Stanley Dep. 87:11-23.) Plaintiff testified that the Flight Attendant Manual ("FAM") was a flight attendant's "bible" and was required to be carried at all times and updated as necessary. (Stanley Dep. 89:4-8. 92:13-24; Stanley Dep. Attachment 11, Flight Attendant Manual Excerpts.) The FAM outlines an Express Jet Flight Attendant's job responsibilities, obligates a Flight Attendant to "perform[] all duties as outlined in the Express Jet Flight Attendant Manual, Company Policy Manuals, and duties as assigned by the Captain," and specifically references the responsibility of a Flight Attendant to "attend to all passenger requests, including beverages, alcohol and/or other snacks." (FAM Service Policy, PgID 1158, 1170.) Plaintiff understood that she was responsible for performing all of the duties as outlined in the FAM. (Stanley Dep. 93:17-23.) The FAM also outlines the "normal chain of command" on an Express Jet aircraft as follows: "1. Captain, 2. First Officer, 3. Flight Attendant "A", 4. Flight Attendant "B"." (FAM Chain of Command, PgID 1166.) The Chain of Command further provides that "[t]he most senior Flight Attendant at duty-in shall either assume the A position or assign the A position to the other assigned Flight Attendant." (*Id.*) Ms. Stanley understood this hierarchy and also understood that the more senior Flight Attendant could choose whether he or she wanted position "A" or position "B" and that Flight Attendant "A" would be positioned in First Class and Flight Attendant "B"

would be positioned in the main cabin. (Stanley Dep. 95:8-24.) Ms. Stanley specifically testified to her understanding that seniority "gave you better choices," and that as the senior Flight Attendant "[y]ou have the pick of what position you want on an aircraft." (Stanley Dep. 117:4-118:19.) Ms. Stanley understood that there was this division of responsibilities and that the Flight Attendants were expected to "work as a team," and perform the other Flight Attendant's duties when necessary to get the job done. (Stanley Dep. 96:9-97:8.)

The FAM contains specific detail regarding the duties of a Flight Attendant assigned as the Flight Attendant on a one-Flight Attendant aircraft and the duties assigned to the "A" and "B" Flight Attendants when two Flight Attendants are on board an aircraft. (FAM Phases of Flight Overview PgID 1160-64.) Ms. Stanley also recalled having received, or been given access online to, the Flight Attendant Handbook. (Stanley Dep. 100:9-11; Stanley Dep. Attach. 12, 4/24/15 ExpressJet Flight Attendant Handbook.) The Flight Attendant Handbook ("FAH") outlines many employment related guidelines, including general serving guidelines and parameters, and specifically guidelines regarding the service of alcohol. (FAM § 3-6.1, PgID 1206-11.) The FAM also outlines the general guidelines for service in Delta First Class cabins. Specifically, the FAM provides, among other guidelines, that: "FA "A" is responsible for conducting a pre-departure beverage service to all First Class

customers, to include a full selection including alcoholic beverages." (FAM § 3-4.1, PgID 1196.) The FAM further provides that: "FA "B" should assist with First Class pre-departure service. For example, FA "A" may take orders, hang coats and serve beverages, while FA "B" remains in the galley to greet boarding customers, prepare beverages and control boarding traffic to allow FA "A" to move about the First Class cabin." (*Id*.) The FAM provides that Flight Attendants are primarily responsible for their "A" or "B" duties but are "encouraged to work together and assist each other with completing all required service on the aircraft." (*Id*.) As far as the serving of alcohol, Ms. Stanley testified that "[t]here are flights that no one asks for it, and there are flights when everybody seemingly asks for it," and "everything in between." (Stanley Dep. 123:13-15.) The job posting for the Flight Attendant position that was in effect when Plaintiff applied for a job and to which Plaintiff would have responded in applying for a position as an Express Jet Flight Attendant, expressly stated that the job duties of Flight Attendant required the selling of "food and alcoholic beverages to passengers . . . ." (Stanley Dep. 76:10-77:6; Attachment 3, Job Posting for Flight Attendant.) Ms. Stanley recalled reading the job posting online for the Flight Attendant position, although she could not remember the specific details of the posting. (Stanley Dep. 80:21-81:1.)

And Ms. Stanley performed all of her job responsibilities, and did serve alcohol, through the first year and a half of her service as an Express Jet Flight Attendant, and was considered very professional and attentive and a good employee, with no history of customer complaints. (Def.'s Mot. Summ. J. Ex. F, April 10, 2018 Deposition of Melanie Brown 39:13-41:1. 36:23-37:11.) However, sometime in early June, 2015, Plaintiff learned that she was prohibited not only from consuming alcohol, but also from preparing and/or serving alcohol. (Stanley Dep. 119:7-120:12.) Plaintiff testified that she learned of this prohibition during a conversation with an Imam with whom she discussed questions that would arise as she studied Islam and read the Quran. Plaintiff explained to the Imam that she was required to serve and sell alcohol at work and he told her that she was not supposed to drink or serve/sell alcohol, but told her "don't quit your job . . . you can't quit your job . . . you just pray to Allah to give you something better." (Stanley Dep. 119:22-120:5.)

Following this discussion with her Imam, on or about June 2, 2015, which was the next time she went to work and had an opportunity to speak to Melanie Brown, the chief flight attendant at the Detroit Express Jet base, she explained to Ms. Brown that she had learned from her Imam that she was not supposed to serve or sell alcohol. (Stanley Dep. 118:24-119:6, 121:21-122:2.) Plaintiff explained to Ms. Brown what she had learned from the Imam and according to Plaintiff, Ms. Brown told her that it

shouldn't be a problem for Plaintiff to "just make an arrangement with the other flight attendant," to serve any alcoholic beverages that customers requested from the Plaintiff. According to Ms. Stanley, Ms. Brown implied that it was "an easy fix." (Stanley Dep. 122:9-23.) Plaintiff did testify that Ms. Brown told her that Ms. Brown would "have to look into it" but that Plaintiff should go ahead and "make an arrangement" with the other flight attendant. (*Id*.) During this conversation with Ms. Brown, Plaintiff mentioned that the month of Ramadan was about to start and she did not want to go into that holy month doing something that she now knew she was not supposed to do. Ms. Brown also mentioned to Plaintiff, who wanted to take time off for Ramadan, that Plaintiff could take Time Off Without Pay ("TOWOP") for the month of Ramadan, which Plaintiff decided to do. (Stanley Dep. 124:12- 125:14.)

Ms. Brown memorialized this conversation with Plaintiff in a "daily note" log for entry in the "crew resource management system." Ms. Brown would have made this entry in her daily log and asked Ms. Holland, identified as the "creator" on the entry, to enter it into the crew resource management system so that it could be placed in Plaintiff's profile. (Stanley Dep. 64:22-68:15, 98:8-99:22.) Ms. Holland would have copied and pasted Ms. Brown's daily note memorializing the June 2, 2015 meeting with the Plaintiff, which states as follows:

> M. Brown DN 6-2-15 as we enter the season of Ramadan, FA raised concerns about not being able to serve alcohol as a tenant [sic] of her

faith. We discussed the options she has and ultimately the decision regarding her continued employment rests with her. I explained TOWOP for the month of July, which if awarded will assist, however it is not a permanent solution. I suggested she work with her fellow FAs on board to assist during service, suggested she work the main cabin where alcohol is purchased thus potentially limiting her interaction. Recommended she look at our Careers tab to see if there was another position within the company she may be able to apply for. I also sought guidance from Kaylee Davis.

(Brown Dep. Attachment 6.) Ms. Davis was an individual from Express Jet's Human Resource Department and Ms. Brown could not recall if she called Ms. Davis or emailed her but she did recall that she also spoke with Mr. Curtin, Director of In Flight Operations, who directed her to Ms. Davis to see about any special accommodation form that might be available to Plaintiff and what to do if Plaintiff submitted such a request. (Brown Dep. 103:10-107:11.)

Ms. Brown understood Plaintiff to be asking about how to handle her inability to serve and sell alcohol on a particular upcoming flight due to the observance of the Ramadan holiday. Ms. Brown stated that Plaintiff explained in the June 2, 2015 meeting that she had just learned "she could not serve alcohol because she was going into Ramadan and she did not feel comfortable on" the flight she was about to board and Plaintiff "didn't speak beyond that flight." (Brown Dep. 91:2-21.) "It was regarding that specific flight, and [Plaintiff] was beginning to observe Ramadan. . . . Ramadan was the catalyst for that." (Brown Dep. 92:3-8.) Ms. Brown testified: "My

advice to her because we were within minutes of that flight departing was to speak to her fellow flight attendant, express her concern and ask if he would assist her on that flight." (Brown Dep. 94:22-25.) Ms. Brown did not interpret that Plaintiff was making a formal accommodation request when she came to speak with Ms. Brown on June 2, 2015, about how to handle her problem with serving alcohol on a flight that was about to depart. (Brown Dep. 164:3-165:12.)

Plaintiff left the June 2, 2015 meeting with Ms. Brown with a different impression: Plaintiff thought that the arrangement whereby she would ask fellow Flight Attendants to perform Plaintiff's alcohol service duties was a permanent arrangement and that going forward, after Plaintiff returned from her TOWOP for the month of Ramadan, she would "just pick up and do the same," and just "work with the other flight attendants," and she did not walk away from the June 2, 2015 meeting with Ms. Brown thinking it was a temporary arrangement. (Stanley Dep. 127:13-130:18.) Plaintiff never thought the arrangement suggested by Ms. Brown, whereby Plaintiff would ask the other Flight Attendant with whom she was assigned to fly that day whether they would serve alcohol for the Plaintiff, was "temporary." (Stanley Dep. 182:16-22.)

On Friday, June 7, 2015, Ms. Brown received an email from Chief Flight Attendant Amy Cain, who reported a call she received from Flight Attendant Abdel

Aafifi, complaining about Plaintiff's refusal to help him assist with the beverage service in First Class due to her inability "to pour or serve alcohol during this time due to her religion." (Brown Dep. 115:16-116:15; Brown Dep. Attachment 7.) Ms. Cain reported that "as the senior FA, he is requesting assistance with first class but she is refusing." (Brown Dep. Attachment 7.) Ms. Brown forwarded this email to Mr. Rick Berry, employee relations manager, and subsequently met with Mr. Aafifi regarding this complaint. Mr. Aafifi he explained that there was "a lot of extra work" that he was required to do when he was flying with Ms. Stanley and he felt it was "unfair." Mr. Aafifi never filed a formal complaint regarding Ms. Stanley. (Brown Dep. 116:19-119:16.)

Ms. Stanley was then away on TOWOP for the remainder of Ramadan and Express Jet received no further complaints about Ms. Stanley until Express Jet received an Irregular Operations Report ("IOR") from Flight Attendant Katie Hice on August 2, 2015, after Plaintiff had returned from her TOWOP for Ramadan. Ms. Hice's IOR read in full as follows:

> I worked with flight attendant Charee Stanley who refused to do her flight attendant duties and failed to follow ExpressJet policies. I was asked by FA Charee Stanley to serve ALL alcoholic beverages on flights DL5319 dtw/orf, DL5319 orf/dtw, DL5237 dtw/yul, DL 5025 yul/dtw because she said she had since being hired converted to a different religion which is now Muslim and she isn't allowed to serve alcohol now. She said she knows she is supposed to serve alcohol but she can't/won't serve alcoholic beverages. Several times Charee Stanley

was in the galley reading a small book with foreign writing in it. It was extremely hard to do both FA A and FA B duties. I served the alcoholic beverages to first class on the ground, completed FA B duties, served first class alcoholic beverages once in the air, served economy comfort and economy and then when bringing the cart back to the galley first class needed to be attended to again. I don't know what she was doing while I was busy with passengers and serving. When I would get to the galley she had out her food, her phone, her book with foreign writings or taking things in and out of her bags. Once when the captain said to close the main cabin door she hesitated because she was having a conversation with a ramper about where she should move to in Detroit (good area) and didn't close the door until her conversation was complete. The captain had even got me to tell her to close the door and I did but she did what she wanted and finished her conversation first. Charee also wore a headress upon her head. Twice Charee came to switch with me so I could serve alcoholic beverages to first class while I was serving in the back. First class needed more than just alcoholic beverages as I ended up giving other drinks as well and tidying up as they handed me things they wished to discard.

(Stanley Dep. Attachment 15.)

Plaintiff testified that indeed Ms. Hice did perform all of Plaintiff's alcohol serving duties on four different flights and Plaintiff explained that she and Ms. Hice would "swap" positions, like this:

Q: So you would swap positions?

A: Correct.

Q: You would go to first class. She would come to the main cabin?

A: And then once she serves, I would go back to main cabin so she can go back to first class.

Q: So she would come to you, she would make the drinks. In the

12

meantime you'd go up to the first class passengers?

A: Yes.

Q: And you were just, at that point, I assume walking through the first-class cabin and making sure everyone's okay, seeing if they need anything.

A: Yes.

Q: Did it ever – did you ever have first-class passengers ask you for alcohol when you swapped places and went up to first class?

A: Maybe they did, and I took the order and I left it for her when she came back. Because it doesn't take long to make a drink, so once she makes it . . . we were swapping back out. And I would – if there was a request, I would put 1A would like this [alcoholic drink] . . . [s]o that she would know when she came back.

(Stanley Dep. 151:4-152:9.) Plaintiff testified that she gave Ms. Hice "the same spiel [she] gave every flight attendant [she] worked with: As a Muslim, I'm not permitted to do so. Do you mind serving on my behalf . . . ." (Stanley Dep. 153:16-19.) Plaintiff testified that she was never required to work a single Flight Attendant plane so she had never considered what would have occurred had she been the sole Flight Attendant and refused to serve alcohol. After initially not responding to further questions about this issue, Plaintiff eventually responded that Express Jet would have to pull someone from the reserves to take over that flight for the Plaintiff. (Stanley Dep. 174:11-182:4.)

On August 18, 2015, a meeting was held with Plaintiff, Ms. Brown, a Union representative (Nate Wysong), and a human resources representative (Tracy Hassell), to discuss Ms. Hice's IOR and to get "Plaintiff's side of the story." (Brown Dep. 150:15-160:21; Brown Dep. Attachments 9, 10.) The focus of the concern at the meeting was Plaintiff's refusal to serve alcohol and her request to fellow Flight Attendants to additionally perform her alcohol service duties for her. (Brown Dep. 162:21-163:5, Brown Dep. Attachment 10, Melanie Brown 8/18/15 Meeting Notes.) Tracee Hassell explained to Plaintiff at the August 18, 2015 meeting that serving alcohol was a job requirement for a Flight Attendant and that Express Jet could not guarantee Plaintiff that she will always fly with another Flight Attendant who will be willing to perform Plaintiff's alcohol service duties. (Brown 8/18/15 Meeting Notes.) Ms. Brown's meeting notes reflect that Ms. Brown explained to Plaintiff that she had three options: (1) take a personal leave for a period of time to seek another position in the company; (2) make the decision to serve and sell alcohol; or (3) voluntarily resign. (*Id*.) Plaintiff similarly recalled that she was given these options. (Brown Dep. Attachment 13, Plaintiff's 8/18/15 Personal Statement, PgID 2025.)

At the close of the August 18, 2015 meeting, Plaintiff presented Express Jet with a formal request for a religious accommodation not to serve alcohol. (Brown Dep. Attachment 11, Stanley Religious Accommodation Request Form.) Plaintiff also

presented a letter from her attorney, Ms. Lena Masri, explaining that Express Jet's refusal to accommodate Plaintiff's sincerely-held religious belief that prohibited her from serving alcohol was a violation of Title VII of the Civil Rights Act of 1964. (Brown Dep. Attachment 12, 8/18/15 Masri Letter.)

On August 19, 2015, before Plaintiff had the opportunity to elect one of the three options presented to her at the August 18, 2015 meeting, Express Jet informed Plaintiff that she had been placed on a 90-day non-disciplinary, unpaid administrative leave of absence, which was later extended to a year, to allow her to seek another position with Express Jet. (Curtin Decl. ¶ 38.) Express Jet placed Plaintiff on this 90-day leave before she had an opportunity to select one of the three options presented to her at the August 18, 2015 meeting because she was scheduled to work the day after the meeting and "ExpressJet needed to categorize her status in its scheduling and payroll systems." (*Id*.) Also on August 19, 2015, Plaintiff received a call from ExpressJet informing her that the leave had been extended to a 12-month leave. (Stanley Dep. 184:6-14; Brown Dep. Attachment 15, PgID 2040.)

On August 25, 2018, Express Jet sent Plaintiff a letter informing her that serving alcoholic beverages to customers on their request was "an essential function of the Flight Attendant position," and that it would be "unrealistic and operationally difficult for the Company to require Flight Attendants, with whom [Plaintiff] might

be flying [], to assume this duty on [her] behalf, while still performing their duties as outlined in the Flight Attendant Manual." Furthermore, ExpressJet noted that it could not guarantee that Plaintiff would always be assigned to a two (2) flight attendant aircraft. Therefore, ExpressJet found Plaintiff's request for an accommodation "to be unreasonable and [not able to be] honored." (Brown Dep. Attachment 15, 8/25/15 Denial Letter.) The 8/25/15 Letter encouraged Plaintiff to take advantage of her one-year administrative leave to find another position with ExpressJet. (*Id*.)

Plaintiff testified that there was "no discretion" within the Islamic faith for her to serve alcohol under any circumstance and she stated that she was not willing to violate that proscription. (Stanley Dep. 187:21-188:3.) But in Plaintiff's opinion, Express Jet had already granted her an accommodation that was "their idea" – that being Ms. Brown's verbal suggestion to Plaintiff on June 2, 2015, as to how she should handle the impending situation with her upcoming flight – and as a result of her doing what they told her to do, they unjustifiably took her job away. (Stanley Dep. 240:19-241:15.)

### B.    The Provisions of the Governing Collective Bargaining Agreement

As noted *supra*, as a member of the IAM Union, Plaintiff's employment with Express Jet was governed by a CBA. (Def.'s Mot. Summ. J. Ex. A, ASA-AFA 2008 CBA .) Pursuant to that CBA, a Flight Attendant's monthly work schedule is

arranged through a Preferential Bidding System ("PBS") set forth in the CBA. (CBA § 7.C, PgID 766.) Flight schedules are "constructed preferentially, in order of seniority . . . ." (CBA § 7.C.3.) The CBA expressly provides: "The senior Flight Attendant may choose the "A" or "B" position on the aircraft." (Def.'s Mot. Summ. J. Ex. A, ASA-AFA 2008 CBA § 7.W.1., PgID 779.) The CBA further provides: "Seniority shall govern all Flight Attendants in the case of bidding rights, filling of vacancies . . . vacation preferences, and domicile assignments." (*Id.* § 11.E.1., PgID 798.) If a 2 (two) Flight Attendant aircraft is downgraded to a 1 (one) Flight Attendant aircraft, the senior Flight Attendant has the right to accept or decline the downgrade: "If more Flight Attendants than needed are scheduled for and report for the same trip (as a result of scheduling error, downgrade, etc.) the choice to remain on the trip from amongst the reporting regular lineholders shall be on a seniority basis." (CBA § 7.W.2.) If the senior Flight Attendant declined the downgrade, the junior Flight Attendant would be required to accept the trip. (Curtin Decl. ¶ 15.) If the junior Flight Attendant refused to accept the downgrade, and no reserves were available to fill the spot, the senior Flight Attendant would be recalled, which would violate Section 7.W.2 of the CBA. (*Id.*) Express Jet has never granted a Flight Attendant a permanent accommodation that violated the seniority provisions of the CBA. (Curtin Decl. ¶ 27.) If the senior Flight Attendant refused to voluntarily

perform Plaintiff's alcohol service responsibilities for her, or refused to accept a downgrade, and Express Jet forced the senior Flight Attendant to perform those duties, Express Jet would be subject to a grievance by the Union claiming that Express Jet violated the seniority provisions of the CBA, as evidenced by Mr. Aafifi's complaint that as the "senior" Flight Attendant, he had the right to request Plaintiff's assistance with serving alcoholic beverages to First Class. (Curtin Decl. ¶ 33.) The Union concedes that providing Plaintiff with an accommodation not to be placed on a single flight attendant aircraft could violate seniority and a grievance could be filed for violation of the CBA seniority provisions. (Def.'s Mot. Summ. J. Ex. D, March 28, 2018 Deposition of Yvette Marche Cooper 12:5-23.)

## II.    LEGAL STANDARD[1]

Summary judgment is appropriate where the moving party demonstrates that

---

[1] As this Court noted in its Opinion and Order denying Defendant's motion to dismiss, while some courts analyze RLA preemption arguments under Fed. R. Civ. P. 12(b)(1) as implicating the court's subject matter jurisdiction to hear the claim, the Sixth Circuit has held that "completion of the RLA-mandated arbitral process does not affect a district court's subject matter jurisdiction over a claim but instead goes to the court's ability to reach the merits of a dispute and grant relief. . . ." *Emswiler v. CSX Transp., Inc*., 691 F.3d 782, 790 (6th Cir. 2012). *See also Upperman v. Southwest Airlines Co*., No. 17-cv-00348, 2018 WL 527376, at *2-3 (S.D. Ohio Jan. 24, 2018) (denying a motion to dismiss on RLA preemption grounds for lack of subject matter jurisdiction, citing *Emswiler* and observing that "[t]he Sixth Circuit has squarely held that exhaustion of the RLA's arbitration procedures, while necessary for a court to reach the merits of an RLA minor dispute, is not jurisdictional in nature").

there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than

mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.    ANALYSIS

### A.    "Undue Hardship" in The Context of a Title VII Claim of Religious Discrimination Implicating the Collectively Bargained Rights of Co-Workers

"The analysis of any religious accommodation case begins with the question of whether the employee has established a *prima facie* case of religious discrimination." *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, 516 (6th Cir. 2002) (internal quotation marks and citation omitted). "To establish a *prima facie* case, a plaintiff must demonstrate that 1) [s]he holds a sincere religious belief that conflicts with an employment requirement; 2) [s]he has informed the employer about the conflicts; and 3) [s]he was discharged or disciplined for failing to comply with the

20

conflicting employment requirement." *Id*. "Once the plaintiff has established a *prima*

*facie* case, the burden shifts to the defendant employer to show that it could not

reasonably accommodate the employee without undue hardship." *Id*. Here,

ExpressJet assumes for purposes of its motion for summary judgment, "that Stanley

has established a *prima facie* case of failure to accommodate her religious beliefs."

(Def.'s Mot. 10 n. 13, PgID 580). Thus, we need only address here the issue of undue

hardship:

> This case requires us to interpret a provision of Title VII of the Civil
> Rights Act of 1964 that prohibits an employer from taking an adverse
> employment action (refusal to hire, discharge, etc.) "against any
> individual . . . because of[1] such individual's . . . religion." 42 U.S.C. §
> 2000e–2(a). Another provision states that the term "religion" "includes
> all aspects of religious observance and practice, as well as belief, unless
> an employer demonstrates that he is unable to reasonably accommodate
> to an employee's or prospective employee's religious observance or
> practice without undue hardship on the conduct of the employer's
> business." § 2000e(j). When these two provisions are put together, the
> following rule (expressed in somewhat simplified terms) results: An
> employer may not take an adverse employment action against an
> applicant or employee because of any aspect of that individual's religious
> observance or practice unless the employer demonstrates that it is unable
> to reasonably accommodate that observance or practice without undue
> hardship.
>
>> [1]Under 42 U.S.C. § 2000e–2(m), an employer takes an
>> action "because of" religion if religion is a "motivating
>> factor" in the decision.

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc*., 135 S. Ct. 2028, 2034 (2015) (Alito,

J., concurring).  The phrase "unless the employer demonstrates that it is unable to

reasonably accommodate that observance or practice without undue hardship," creates a defense for the employer and "place[s] upon the employer the burden of establishing an 'undue hardship' defense." *Id.* at 2032 n. 2 (Scalia, J.).

In *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041 (7th Cir. 1996), analogizing to the standards for analyzing Title VII religious discrimination claims, the Seventh Circuit Court of Appeals held "that the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees." *Id.* at 1051. "A 'bona fide' seniority system is one that was created for legitimate purposes, rather than for the purpose of discrimination." *Id.* at 1046 n. 7. In so holding, the Seventh Circuit directly analogized the ADA claim it was called upon to review to claims for religious accommodations under Title VII:

> Title VII of the Civil Rights Act of 1964 also contains a duty of "reasonable accommodation," in this case to the religions of employees. Initially it emerged within 1966 EEOC guidelines interpreting Title VII, see 29 C.F.R. § 1605.2(b) (1968), and in 1972 it was incorporated into Title VII itself. 42 U.S.C. § 2000e(j). Under Title VII an employer must "reasonably accommodate" the religious observances and practices of its employees, up to the point of "undue hardship on the conduct of the employer's business." *Id.* In *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court considered a conflict between a demand for a particular "reasonable accommodation" under Title VII (being relieved from Saturday work duties, as required by the plaintiff's religion) and the seniority rights of other employees under a collective bargaining agreement (since more senior employees would be required to work in the plaintiff's stead). The Supreme Court decisively rejected the position of Hardison and the EEOC that the statutory requirement to accommodate necessarily

superseded the collectively-bargained seniority rights of the other employees: "We agree that neither a collective bargaining contract nor a seniority system may be employed to violate a statute, but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement." *Id*. at 79, 97 S.Ct. at 2274.

94 F.3d at 1048. As the Seventh Circuit noted in *Eckles*, the case for drawing the line under Title VII for accommodating religious beliefs at the interference with bona fide seniority rights finds support in the provision within Title VII expressly limiting an employer's obligation to provide accommodation in the case of a "bona fide" seniority system:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(h).

The Sixth Circuit has expressly held that any accommodation that "will result in a violation of the seniority provisions of the collective bargaining agreement, and affect the shift and job preferences and contractual rights of other employees," constitutes an undue hardship. *Virts*, 285 F.3d at 517. *Virts* is relevant here and merits further discussion. In *Virts*, the plaintiff, a "born again Christian," was an "over-the-

road" truck driver for defendant. 285 F.3d at 511. Under the defendant's system for assigning "runs," the more seniority a driver has, the more choices he has in selecting a run. *Id*. Drivers can request certain runs and will be dispatched on runs in the order requested based upon their seniority. *Id*. If the dispatcher exhausts the list and fails to dispatch all of the runs, he drafts drivers "from the bottom of the call board and go[es] up, in order of least seniority to highest, and place[s] drivers in runs they did not request." *Id*. "If a driver is called by the dispatcher, a driver cannot decline to accept the run." *Id*. Plaintiff was dispatched and refused to accept a "sleeper run" – "a run where two drivers are dispatched in a sleeper truck" – with a female co-driver, based upon his sincerely held religious belief that being in the company of a woman under those circumstances violated the tenets of his faith. *Id*. at 512. Due to time factors and the fact that another sleeper run was leaving at the same time, the defendant and a Union representative "made arrangements to switch loads," relieving plaintiff of the obligation to do a run with a female, and told the individuals involved to get with the Union and dispatcher on their return to "review work rules and contract procedures." *Id*. The defendant contended "that by allowing such a swap, the seniority provisions of the [governing collective bargaining agreement] were violated." *Id*. "Upon Plaintiff's return from his run, he was informed that the next time that he was paired with a female on a sleeper run dispatch, he must accept it."

Subsequently, plaintiff declined a second run citing the same religious objection and was deemed to have voluntarily quit based on his failure to report for the run. *Id.* at 513. Plaintiff filed a grievance with the union and the union and defendant denied the grievance, explaining that "there was not any accommodation that could be made for Plaintiff which would not violate the seniority provisions of the collective bargaining agreement ("CBA" or "collective bargaining agreement") and the rights of other bargaining unit members." *Id.* Although defendant ultimately was reinstated to his position, Plaintiff filed a Title VII Religious Discrimination Complaint with the EEOC and received a Right to Sue Letter on January 30, 1998, and filed his complaint in the United States District Court for the Middle District of Tennessee on April 29, 1998. *Id.* at 514.

The district court assumed that plaintiff had established a *prima facie* case of discrimination, but granted summary judgment to the defendant, finding that defendant could not reasonably accommodate the plaintiff without undue hardship and the Sixth Circuit affirmed. *Id.* at 516-17. In reaching its decision in *Virts*, the Sixth Circuit relied, as the district court had done, on *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977):

> In *Hardison*, the Supreme Court looked at seniority systems as they relate to an employer's attempt to reasonably accommodate an employee's sincere religious beliefs. *See Hardison*, 432 U.S. at 81, 97 S.Ct. 2264. In the course of doing so, the Court noted that to

accommodate the plaintiff's claim-that the employer discriminated against the plaintiff on the basis of his religion in failing to provide the plaintiff with Saturdays off-the employer would have had to violate its seniority system. *Id.* The Court then opined that it "would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far." *Id.*

*Virts*, 285 F.3d at 517. *See also Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir. 1994) (relying on *Hardison* to deny a requested religious accommodation and observing that "it 'would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preferences of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others[.]'") (quoting *Hardison*, 432 U.S. at 81); *Crider v. University of Tennessee, Knoxville*, 492 F. App'x 609, at *5 (6th Cir. 2012) (table case) (discussing *Hardison* and acknowledging that requiring an employer "to breach the contractual rights of its employees by abandoning the seniority system established by a collective bargaining agreement," creates an undue hardship). *See also Prach v. Hollywood Supermarket, Inc.*, No. 09-cv-13756, 2010 WL 3419461, at *5 (E.D. Mich. Aug. 27, 2010) ("employers are not required to engage in proposed accommodations that have the ability to violate a CBA by interfering with a valid seniority system") (citing *Virts*, 285 F.3d at 519 and *Hardison*,

432 U.S. at 79).

Nor is an employer required to wait for this eventuality to occur before denying Plaintiff's requested accommodation. *Virts*, 285 F.3d at 519 (observing that "an employer does not have to actually experience the hardship in order for the hardship to be recognized as too great to be reasonable") (citing *Hardison*, 432 U.S. at 81). As *Virts* established, "[t]he mere possibility of an adverse impact on co-workers as a result of [swapping positions] is sufficient to constitute an undue hardship."*Virts*, 285 F.3d at 520 (internal quotation marks and citation omitted) (second alteration added).

Plaintiff argues that "the Sixth Circuit has held that it is incumbent on an employer to at least 'explore a voluntary waiver of seniority rights' from others before taking adverse action against a religious employee." (Pl.'s Resp. 18, PgID 2434) (quoting *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991)). But this is both a misstatement of Sixth Circuit law and a misrepresentation of the requested accommodation here. As discussed *supra*, Plaintiff is not seeking an accommodation that would give co-workers an option to "voluntarily" waive their seniority rights to accommodate her. She has testified that she will not prepare or serve alcohol under any circumstance, i.e. even if they refuse. Thus, her requested accommodation necessarily demands that they agree to do so. But more importantly, the Sixth Circuit in *Virts* expressly distinguished *Arlington Transit*, noting that

27

"*Arlington* . . . did not involve a collective bargaining agreement and a seniority system, nor the concerns associated therewith." *Virts*, 285 F.3d at 519. "In other words," the Sixth Circuit continued, "the array of concerns spoken of by the Supreme Court in relation to a collective bargaining agreement and the role it plays in determining whether a proposed accommodation rises to the level of an undue hardship were not present in *Arlington*." *Id*. At the hearing on the motion for summary judgment, Plaintiff's counsel continued to insist (misguidedly) that *Arlington* involved a CBA. It *did not* involve a CBA and *Arlington Transit* is inapt. *See Prach v. Hollywood Supermarket, Inc.*, No. 09-cv-13756, 2010 WL 4608782, at *1 (E.D. Mich. Nov. 5, 2010) (Duggan, J.) (denying plaintiff's motion for reconsideration and distinguishing *Arlington* as not involving a CBA and observing that the Sixth Circuit's decision in *Virts* established that "employers are not required to accommodate where the proposed accommodations would violate a collective bargaining agreement").

Undue hardship, if established by a defendant in response to a plaintiff's failure to accommodate claim, will be dispositive of the plaintiff's claim. *Virts* instructs that a proposed accommodation that would violate a collective bargaining agreement necessarily constitutes an undue hardship. ExpressJet argues that Plaintiff's requested accommodation to never be required to prepare/serve/sell alcohol violates the CBA's

28

seniority provisions in numerous ways. Plaintiff disagrees that the seniority provisions of the CBA are implicated by her requested accommodation. The Court concludes, as discussed *infra*, that the answer to the question whether or not ExpressJet can establish undue hardship requires an interpretation of the governing CBA, and thus Plaintiff's failure to accommodate claim is preempted (or precluded) by the RLA.

### B.    Preemption/Preclusion of Plaintiff's Failure to Accommodate Claim Under the RLA

"The RLA, which was extended in 1936 to cover the airline industry, sets up a mandatory arbitral mechanism to handle disputes growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994) (internal quotation marks and citations omitted). "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id.* at 252. The RLA's "mandatory arbitral mechanism" addresses two classes of disputes. *Id*. at 252. "The first class, those concerning rates of pay, rules or working conditions,  are deemed "major" disputes. Major disputes relate to  the formation of collective [bargaining] agreements or efforts to secure them." *Id*. (internal citations and quotation marks omitted) (alteration in original). "The second class of disputes, known as "minor"

disputes, gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. Minor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation. Thus, major disputes seek to create contractual rights, minor disputes to enforce them." *Id*. at 252-53 (internal citations and quotation marks omitted) (alteration in original). Minor disputes "must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions." *Id*. at 253 (internal citations and quotation marks omitted). "Thus, a determination that [Plaintiff's] complaints constitute a minor dispute would pre-empt [her] state law actions."[2] *Id.*

---

[2] As several courts have recognized, when the plaintiff claims that defendant violated a federal statute, rather than a state law, the issue is one of preclusion, not preemption. *See, e.g. Brown v. Illinois Central R.R. Co*., 254 F.3d 654, 662 (7th Cir. 2001) (Noting that cases holding that the RLA's mandatory arbitration provisions preempt state law claims whose resolution depends upon the interpretation of a CBA, do not necessarily preclude similar claims brought under federal statutes which require an analysis of competing federal statutes to determine whether they can be harmonized, but finding "the preemption question sufficiently similar to the preclusion question to make the analysis employed in the RLA preemption cases applicable" in the preclusion context) (collecting cases applying the RLA preemption standard to cases involving a federal statute). *See also Parker v. American Airlines, Inc.*, 516 F. Supp. 2d 632, 637-38 (N.D. Tex. 2007) ("Arbitral boards established under the RLA enjoy exclusive jurisdiction to resolve all disputes requiring the construction or application of a CBA regardless of whether the dispute involves a state-law claim or a federal claim. When applied to a state-law claim, the RLA is said to preempt. But when applied to a federal claim, the RLA is said to "preclude.") (internal quotation marks and citation omitted); *VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 269 (N.D. Ill. 2018) (observing that

*See also Smith v. Northwest Airlines, Inc*., 141 F. Supp. 2d 936, 940 (W.D. Tenn. 2001) ("The RLA provides that minor disputes initially be settled through grievance procedures established in the CBA. [45 U.S.C.] § 152 First. If such efforts are unsuccessful, parties are required to submit to binding arbitration by the NRAB [National Railroad Adjustment Board] or a privately established arbitration panel. [45 U.S.C.] § 153 First (i). The NRAB has primary and exclusive jurisdiction over minor disputes.") (citing *Glover v. St. Louis–San Francisco Ry. Co.*, 393 U.S. 324, 328 (1969)"). *See Dotson v. Norfolk Southern R.R. Co*., 52 F. App'x 655, 658 (6th Cir. 2002) ("'If the parties cannot resolve minor disputes on their own, they are submitted to the National Railroad Adjustment Board ["NRAB"] for final resolution. 45 U.S.C. § 153, First (i) & (m). The Board has exclusive jurisdiction over minor disputes, and a party cannot bypass the Board and take the dispute into federal court, except to enforce the Board's award.'") (quoting *CSX Transp., Inc. v. Marquar*, 980 F.2d 359, 361 (6th Cir. 1992) and *Airline Professionals Ass'n of Intern. Broth. of Teamsters, Local Union No. 1224, AFL-CIO v. ABX Air, Inc*., 274 F.3d 1023, 1028 (6th Cir. 2001) ("[t]he adjustment board exercises exclusive jurisdiction over minor

it is "well settled that the RLA requires mandatory arbitration" of minor disputes, and noting that "[s]uch disputes are thus 'preempted' (if raised in a state claim) or 'precluded' (if raised in a federal claim)"). The Court will generally use the term "preemption" in its analysis of both Plaintiff's federal and state law claims understanding this distinction.

disputes")).[3] "In determining appropriate preemption standards under the RLA, cases decided under the Labor Management Relations Act ("LMRA") provide useful guidance. *Hawaiian Airlines*, 512 U.S. at 263 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988) (a case involving preemption under section 301 of the LMRA).

Defendant contends that Plaintiff's failure to accommodate claim is a "minor dispute" that is subject to mandatory arbitration and thus preempted by the RLA. For the Plaintiff's claim to be preempted (or precluded) under the RLA, its resolution must "depend[] on an interpretation of the CBA." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 792 (6th Cir. 2012). The Sixth Circuit has enunciated a two-step test for determining whether a claim is preempted under the RLA: (1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by plaintiff created by the CBA or by state or federal law. *Id*. If the "claim is not a

---

[3] The RLA requires air carriers to establish "internal dispute-resolution processes and an adjustment board established by the employer and the unions." *Hawaiian Airlines*, 512 U.S. at 253 (citing 45 U.S.C. § 184.). *See Jenisio v. Ozark Airlines, Inc. Retirement Plan for Agent and Clerical Employees*, 187 F.3d 970, 972-73 (8th Cir. 1999) ("The RLA requires air carriers and unions to establish a system board of adjustment (the Board) to resolve all "disputes . . . growing out of . . . the interpretation or application of agreements concerning rates of pay, rules, or working conditions.") (quoting 45 U.S.C. § 184). Thus, in the context of an air carrier, the arbitral body is often referred to as a "system board," or "adjustment board." The terms are used interchangeably in this Opinion and Order.

purely factual question about . . . an employer's conduct and motives and cannot be decided without interpretation of the CBA," it is preempted. *Id.* at 793 (internal quotation marks and citation omitted). Even if an employer's defense, *e.g.* that it had a non-discriminatory or non-retaliatory reason for discharge, "may involve attention to the same factual consideration as the employee's [] claim" the claim will not be preempted unless the claimed right *"depend[s]"* upon an interpretation of the CBA. *Smith*, 141 F. Supp. 2d at 941 (citing *Lingle*, 486 U.S. at 407-08) (emphasis in original). Even if a claim "is grounded upon rights which stem from some source other than the CBA (such as state law), the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be 'conclusively resolved' by interpreting the CBA." *Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001).[4]  A closer examination of a few significant cases best illustrates what type of

---

[4] If "preemption arises in the context of a motion for summary judgment, then the court extends the inquiry to all stages of the analysis that it would reach when deciding the case on its merits." *Douglass v. Carlex Glass Co., LLC*, No. 14-cv-468, 2015 WL 12532115, at *4 (E.D. Tenn. Sept. 30, 2015) (addressing preemption in the context of the LMRA) (internal quotation marks and citations omitted). *See also Howard v. Cumberland River Coal Co.*, 838 F. Supp. 2d 577, 583 (E.D. Ky. 2011) ("Because this case raises LMRA preemption in the summary judgment context, this Court must determine whether Howard's prima facie case, Cumberland's legitimate, non-retaliatory reason, or Howard's proof of pretext requires interpreting the CBA. "). As the Supreme Court noted in *Hawaiian Airlines*, LMRA preemption law guides the analysis in the RLA preemption context because the preemption standards are "virtually identical." 512 U.S. at 260.  There can be no objection by Plaintiff that the issues requiring the Court to examine and interpret the CBA arise in the context of

dispute will fall into the "preempted/precluded" category and what type of dispute will be considered "independent" of the CBA and not "preempted/precluded."

In *Hawaiian Airlines*, *supra*, the plaintiff was terminated for refusing to sign a maintenance record attesting that the repair he had been ordered to make rendered the airplane fit to fly. 512 U.S. at 249. The employer argued that the plaintiff's wrongful discharge and whistleblower claims were preempted because the discharge was justified under the "just cause" provision of the CBA and that therefore resolving the claim required interpreting the CBA. 512 U.S. at 251. The Supreme Court rejected this argument, holding that although the just cause analysis might involve consideration of many of the same facts as the plaintiff's whistleblower and wrongful discharge claims, the state law claims could be resolved without interpreting the CBA itself, and therefore the claim was "independent" for preemption purposes. *Id*. at 262. Preemption will occur only where the state law claim is dependent on an interpretation the CBA. In the case of the airplane mechanic in *Hawaiian Airlines*, resolution of "purely factual questions about an employee's conduct or an employer's conduct and motives d[id] not require [the] court to interpret any term of a collective-bargaining agreement." *Id*. at 261 (internal quotation marks and citation omitted) (alterations added).

—————————————

ExpressJet's burden to establish undue hardship at this summary judgment stage.

In *Brown*, *supra*, the plaintiff claimed that defendant violated the Americans With Disabilities Act ("ADA") by medically disqualifying him from his position and refusing to accommodate his inability to be available for work seven days a week. 254 F.3d at 656-57. Plaintiff suffered from schizoaffective disorder but claimed that he was qualified to work his desired position as a trainman with the reasonable accommodation of being allowed to be unavailable two days per week. *Id*. The defendant argued that granting the plaintiff this accommodation would require the creation of a new position, i.e. one that required availability fewer than 7 days a week, and that offering such a new position to plaintiff without first offering the new position to employees with greater seniority would flout the general seniority provisions established under the CBA. *Id*. at 660. The Seventh Circuit held that the plaintiff's claim under the ADA did require an interpretation of the CBA because it seemed "quite possible" that the accommodation plaintiff sought would create a new position that would be required to be subject to bidding under the CBA and that offering the position to plaintiff without first offering the position to more senior trainmen "might very well violate the seniority system established by the CBA." *Id*. at 661. Additionally, the Seventh Circuit noted, a determination of whether plaintiff's requested accommodation would violate his employer's seniority system was potentially dispositive of his ADA claim as a matter of law because "the ADA does

not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees." *See also Eckles*, 94 F.3d at 1051 (finding "that collectively bargained seniority rights have a pre-existing special status in the law and that Congress to date has shown no intent to alter this status by the duties created under the ADA").

"[T]he RLA does not automatically preclude all claims brought under independent federal statutes merely because the same conduct could be characterized as a violation of the CBA and grieved pursuant to the RLA." *Brown*, 254 F.3d at 666. But "claims brought under federal or state statutes which can be 'conclusively resolved' by an interpretation of a CBA are not truly 'independent' from the CBA, and are therefore precluded by the RLA." *Id*. at 667 (citing *Hawaiian Airlines*, 512 U.S. at 257-63). The Seventh Circuit summarized:

> It remains true as a *general rule* that the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court (because such claims are generally independent of the CBA and will be adjudicated under non-CBA standards). However, this rule no longer applies if the federal claim asserted by the plaintiff depends for its resolution on the interpretation of a CBA. Such claims are not "independent" of the CBA regardless of their source, and are therefore precluded by the RLA.
>
> We close by stressing the limited scope of our holding. A claim brought under an independent federal statute is precluded by the RLA only if it can be dispositively resolved through an interpretation of a CBA. This occurs "only when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent upon

an analysis of the terms of a collective bargaining agreement." Therefore, an employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim, or by arguing that the action challenged by the plaintiff is "arguably justified" by the terms of a CBA. Nor will a claim be precluded merely because certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor in deciding a claim or a defense. Therefore, Brown's claim would not have been precluded if either the parties did not dispute the interpretation of the relevant CBA provisions (and Brown had merely argued that he was entitled to a certain reasonable accommodation under the ADA notwithstanding anything to the contrary in the CBA), or if the disputed provisions of the CBA were relevant but not dispositive of Brown's claim (as the CBA's provisions describing job functions are in relation to the ADA "essential function" determination). However, because in this case the interpretation of the CBA's seniority provisions could dispose of Brown's entire ADA claim as a matter of law, his claim is not truly "independent" of the CBA and is precluded by the RLA.

254 F.3d at 667-68 (emphasis in original).

In *Carlson v. CSX Transp., Inc.,* 758 F.3d 819 (7th Cir. 2014), by contrast, the Seventh Circuit reversed the district court's dismissal of plaintiff's Title VII sex discrimination and retaliation claims, rejecting defendant's assertion that the RLA precluded plaintiff's claims because it acted pursuant to the terms of the CBA rather than for discriminatory reasons in denying her certain positions that she claimed were given to less qualified individuals.  Plaintiff claimed that she was not asserting any right under the CBA which in any event did not preclude sex discrimination or retaliation.  *Id*. at 832. Distinguishing *Brown*, the Seventh Circuit rejected defendant's argument that, like the plaintiff in *Brown*, an arbitral ruling that plaintiff was not

qualified for the positions under the terms of the CBA would conclusively resolve her

claims: "The argument [relying on *Brown*] is based on a misunderstanding of the

nature of [plaintiff's] claims. Even if Carlson did not have the qualifications specified

in the collective bargaining agreement, she would still have viable Title VII claims if,

as she alleges, the same potentially disqualifying attributes have been overlooked for

men or for others who have not complained about discrimination." *Id*. at 833. The

Seventh Circuit concluded:

> As we were careful to clarify in *Brown*, a claim is not barred simply because "the action challenged by the plaintiff is 'arguably justified' by the terms of the CBA." 254 F.3d at 668, quoting *Hawaiian Airlines*, 512 U.S. at 265–66, 114 S.Ct. 2239. An "employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim." *Id*. at 668. And the fact that a collective bargaining agreement might be consulted in resolving a plaintiff's claims is insufficient to trigger RLA preclusion. Claims are not precluded just "because certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor in deciding a claim or a defense." *Id*.

> All this is to say that RLA preclusion, properly applied, does nothing more than keep disputes actually arising under a collective bargaining agreement out of court.

758 F.3d at 833.

In *Carlson*, the Seventh Circuit discussed a number of cases that further

highlight the crux of the preemption inquiry, including *Rabé v. United Air Lines, Inc.*,

636 F.3d 866, 873 (7th Cir. 2011). In *Rabé* , the plaintiff (a lesbian) claimed that her

supervisor made comments to her that he believed it is "not right to be gay" and suggesting that he suspected she was a lesbian. *Id*. at 868. That supervisor initiated an investigation, which ultimately led to plaintiff's termination, into plaintiff's misuse of travel vouchers, which plaintiff claimed was a pretext for firing her for discriminatory reasons. *Id*. The "principal focus" of plaintiff's claims, which alleged that she was treated differently than other employees who were similarly situated with respect to their use of company travel vouchers, was "on United managers' subjective reasons for terminating Rabé's employment." *Id*. at 873. The Seventh Circuit again distinguished *Brown*, concluding:

> The collective bargaining agreement is relevant to Rabé's claims because she alleged that the travel-voucher policy was enforced against her in a discriminatory manner, but her claims do not call the policy itself into dispute. *See Carmona v. Southwest Airlines, Co*., 536 F.3d 344, 349-50 (5th Cir. 2008) (reversing dismissal of flight attendant's claims of sex and disability discrimination; claims were not preempted where plaintiff did not challenge collective bargaining agreements or procedures, but alleged their discriminatory application); cf. *Brown*, 254 F.2d at 660-64. Accordingly, we conclude that Rabé's claims are not preempted or precluded by the RLA.

636 F.3d at 873.

Several Sixth Circuit cases address the preemption issue under this same framework. In *Emswiler*, the court concluded that plaintiff's disability discrimination claim turned on the meaning of the CBA phrase "at his earliest opportunity," and concluded that resolving the parties' competing interpretations of that provision would

conclusively determine the plaintiff's claim. 691 F.3d at 793. The court concluded that plaintiff's claims were preempted and plaintiff "was required to exhaust the RLA-mandated arbitral processes before coming to court." *Id*.

In *Dotson*, *supra*, the court concluded that plaintiff's claims of disparate treatment required interpretation of the seniority provisions of the CBA regarding who was eligible to "fill in" when needed and also required interpretation of the requirements for the job of a clerk stenographer. 52 F. App'x at 658. Thus, to dispose of plaintiff's claims, the court would be required to look at and interpret terms of the CBA, and not just evaluate defendant's motives. *Id*. The court concluded that plaintiff's claims were preempted.

Similarly, in *Wellons v. Northwest Airlines, Inc.*, 25 F. App'x 214 (6th Cir. 2001), the court concluded that plaintiff's fraud claim required plaintiff to establish that defendant made a false and material misrepresentation regarding the company's leave policy, which would necessitate the court interpreting the CBA to determine the policies for obtaining leaves of absence. *Id*. at 218. The court concluded that plaintiff's fraud claim was preempted.

Finally, *Schirrick v. Butler Aviation*, 25 F.3d 1050 (6th Cir. 1994) (table case), also involved interpretation of a CBA's seniority provisions. Plaintiff in *Schirrick* worked for defendant fueling and servicing aircraft. When she became pregnant, she

provided a note from her physician indicating that she should avoid all contact with

noxious fumes. *Id.* at *1. After receiving this note, defendant placed plaintiff on

disability leave. Plaintiff had hoped to be switched to a dispatcher position during her

pregnancy and sought her union representative's help in getting another employee to

switch with her, but the other dispatchers had more seniority than plaintiff and the

union could not force them to accommodate plaintiff. *Id.* at *1. Plaintiff filed suit

against defendant claiming violations of the ELCRA and the state's Handicappers

Civil Rights Act for the failure to accommodate plaintiff by moving her to the

dispatch position during her pregnancy. *Id.* at *2. The Sixth Circuit found plaintiff's

claims preempted by the RLA:

> The resolution of this dispute then comes under the terms of the CBA,
> because in order to switch positions, seniority of other persons must be
> taken into consideration. Plaintiff was requesting to be switched to a
> dispatch position, which has a seniority requirement, which is governed
> by the CBA. This claim places the terms of the CBA in issue. Plaintiff
> also claims that defendant violated the contract by placing her on a leave
> of absence. This claim also requires additional examination of the CBA
> provisions relating to job classifications and to medical and pregnancy
> leave. Unlike *Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir.) (en
> banc), *cert. denied*, 493 U.S. 992 (1989), plaintiff's claim requires
> extensive interpretation of the language of the CBA. It is, therefore,
> preempted by federal law, *McCall v. Chesapeake & Ohio Ry.*, 844 F.2d
> 294 (6th Cir.), *cert. denied*, 488 U.S. 879 (1988); *Brown v. American
> Airlines, Inc.*, 593 F.2d 652, 655 (5th Cir. 1979), which indicates that the
> claim must be submitted to arbitration according to the RLA, 45 U.S.C.
> § 184..

25 F.3d at *4.

Plaintiff relies on *Nguyen v. United Air Lines, Inc.*, No. 09-cv-733, 2010 WL 2901878 (W.D. Mich. July 23, 2010), in which the district court held that plaintiff's race, national origin and sex discrimination claims asserted under Title VII were not preempted by the RLA. Noting that "[n]o requirement exists that the collective bargaining agreement be totally irrelevant to the dispute" the court observed that "Plaintiff's claims cannot be conclusively resolved looking at the collective bargaining agreement, but instead require a factual determination of Defendant's acts and motivations." *Id*. at *4. The court distinguished *Dotson*, *supra*, concluding that "[n]one of Plaintiff's claims require the court to determine his qualifications or the seniority provisions of the CBA." *Id*.

Plaintiff also relies on *Smith, supra*, but *Smith* simply applies the undisputed propositions that: (1) just because a court must refer to the CBA in adjudicating a claim does not make a claim a minor dispute, and (2) "whether or not an employee has a Title VII discrimination claim is not necessarily answered by looking at the [CBA]." 141 F. Supp. 2d at 944. *Smith* is unhelpful. The district court in *Smith* glosses over the facts of the case to such a degree that it is impossible to glean from the case anything other than general well-established (and undisputed) notions, such as "when a cause of action ultimately concerns an issue unrelated to the CBA, then the RLA does not pre-empt the plaintiff's statutory claim." *Id*. at 942. Providing no discussion

of the factual circumstances of the plaintiff's claims, the court in *Smith* simply concluded that "[i]n determining the validity of Plaintiff's sexual harassment claim, parties will find it unnecessary to consult, even in the most cursory manner, terms in the CBA." *Id*. Without factual context, *Smith* tells this Court nothing about whether or not in this case, on these facts, the Plaintiff's claims concern an issue related to the CBA.

In this case, an examination of the CBA *will* potentially dispose of Plaintiff's claims because under established Sixth Circuit precedent, any accommodation that "will result in a violation of the seniority provisions of the collective bargaining agreement, and affect the shift and job preferences and contractual rights of other employees," constitutes an undue hardship. *Virts*, 285 F.3d at 517. As a threshold matter, the Court clarifies the Plaintiff's requested accommodation: despite what Plaintiff may now suggest about her flexibility to consider "other accommodations," she testified in her deposition that under no circumstances would she be willing to violate the tenet of her faith that precludes her from preparing/serving/selling alcohol. (Stanley Dep. 187:21-188:3.) Thus, Plaintiff requests an accommodation that would: (1) guarantee Plaintiff that every senior Flight Attendant would agree on every flight to perform her alcohol service duties, thus foregoing that Flight Attendant's seniority rights under the CBA to only perform the duties of Flight Attendant "A" or "B" at his

or her election (which ExpressJet argues would violate the governing CBA seniority provisions), (2) guarantee Plaintiff the right to refuse to assist a more senior Flight Attendant with alcohol service duties, despite the requirements of the CBA and FAM that require such cooperation (which ExpressJet argues would violate the governing CBA seniority provisions), (3) guarantee Plaintiff that if a multi-attendant flight to which Plaintiff was assigned was downgraded to a single Flight Attendant flight, the senior Flight Attendant would be required to forego his or her right under the CBA to decline the downgrade, or at the last minute ExpressJet would have to call up a reserve to immediately work the flight (which ExpressJet argues would violate the governing CBA seniority provisions); and (4) guarantee that Plaintiff would never be assigned to a single Flight Attendant aircraft (which ExpressJet argues would violate the governing CBA seniority provisions).

Plaintiff *does not* seek an accommodation that would be observed only insofar as it does not interfere with ExpressJet's seniority system or only insofar as fellow Flight Attendants are agreeable to her request. In fact Plaintiff testified that if a Flight Attendant refused her request at the outset of a flight, Plaintiff could take an unexcused "no show" and the departure could be put on hold while ExpressJet endeavored to call up a reserve (who may or may not be on-site at that time and who may or may not agree to perform Plaintiff's job duties for her). Plaintiff sought an

"upfront" guarantee from ExpressJet that she would *never* be required to prepare or serve alcohol, and expected that other more senior Flight Attendants would surrender their bargained-for rights and agree to perform that duty for her or that ExpressJet would alter operations, delay flight departures, call up reserves, or otherwise figure out a way to accommodate a last minute operational roadblock caused by her refusal to perform her alcohol service duties. While Plaintiff suggests now that ExpressJet could somehow determine in advance a fellow Flight Attendant's agreement to perform Plaintiff's job duties for her, ExpressJet rightly responds that it could never be certain that an "agreeable" Flight Attendant would be available in the event of an unplanned operational event such as a downgrade of equipment or in the event of an "agreeable" Flight Attendant's unplanned unavailability. An "employer [is] not required to make an effort to accommodate the plaintiff, where any attempt at doing so would be fruitless inasmuch as the rights of other employees would be violated, and providing the accommodation would therefore pose an undue burden." *Virts*, 285 F.3d at 508. *See also Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) ("For the purpose of religious accommodations, "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship.'" *Id.* (quoting *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994)).

Given the nature of Plaintiff's requested accommodation, the Court concludes that Plaintiff's Title VII and ELCRA claims are dependent upon interpretation of the CBA. "[B]ecause a CBA, unlike a private contract, is a "'generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate,' *[Consolidated Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299],at 311–12 [(1989)] (internal citation omitted), the major-minor dichotomy treats interpretation or application of express and implied contractual terms indistinguishably." *Brotherhood of Locomotive Engineers and Trainmen v. Union Pacific Railroad Co*., 879 F.3d 754, 758 (7th Cir. 2017). "Thus, the relevant terms of an agreement are not only those that are written down; they also include the parties' practice, usage, and custom as they carry out their agreement." *Id. See also VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 271 (N.D. Ill. 2018) (observing that a "disputed past practice under [a] CBA g[ives] rise to [a] minor dispute requiring interpretation of CBA in light of disputed past practice," and acknowledging that in deciding the preemption issue, "the court may look beyond the explicit terms of the written agreement . . . [and] must interpret the agreement to include recognized past practices"). Thus, when determining whether a dispute requires interpretation of the CBA, and whether preemption is required, past practice and other written materials related to those practices also must be examined to resolve the issue.

The CBA dictates, and the Plaintiff agrees, that the more senior Flight Attendant gets to choose whether he or she wants the "A" or "B" position. While there are instances of voluntary collaboration and cooperation in performing the duties of both the "A" and "B" positions, Plaintiff's requested accommodation mandates her control over the two positions. Both the FAM and FAH, as discussed *supra*, contain specific detail regarding the duties of a Flight Attendant to serve alcohol, including an express directive that Flight Attendant "B" should assist Flight Attendant "A" with the pre-departure service of beverages, including alcoholic beverage preparation and service, which Plaintiff refused to do – prompting Mr. Aafifi's complaint. (FAM § 3-4.1, PgID 1196.) ExpressJet argues that the job duty of Flight Attendants to participate in the service of alcoholic beverages is an established past practice. In fact, Flight Attendant Aafifi's complaint regarding Plaintiff was based upon her refusal to help him (the senior Flight Attendant) service First Class alcoholic beverages pre-flight. Interpretation of the CBA in light of past practices is inherently a task for the system board. *VanSlyck*, 323 F.R.D. at 271 ("it is for the System Board to evaluate this past practice in the context of CBA interpretation; not the Court") (internal quotation marks and citation omitted).

In this case, the CBA provides that the more senior Flight Attendant may choose whether to assume the "A" or "B" position on a flight, and the FAM and the

FAH contained express instruction that all Flight Attendants are to help with the preparation and serving of alcoholic beverages. ExpressJet argues that if Plaintiff is granted an accommodation by ExpressJet relieving her of her duties to prepare and serve alcohol, and guaranteeing that she will never be called upon to prepare and serve alcohol, the seniority provisions of the CBA are necessarily implicated (and according to ExpressJet violated) because the more senior Flight Attendant will be forced to fully perform (not just "help out" occasionally with hot water or tea or extra peanuts, Cooper Dep. 92:5-19) the alcohol service duties of both the "A" and "B" Flight Attendants, in violation of the more senior Flight Attendant's rights under the CBA to elect either the "A" or "B" positions for the flight. Plaintiff's Union representative, Ms. Cooper, conceded that Plaintiff's requested accommodation could violate the seniority provisions of the CBA and could result in the filing of a grievance against ExpressJet under the CBA's seniority provisions.

Plaintiff disagrees that her requested accommodation has any effect on the seniority rights of other Flight Attendants because "everyone has been happy to accommodate her." But the undisputed evidence demonstrates that in the short period of time (approximately three weeks) that she operated under the "duty swapping" arrangement, at least two Flight Attendants verbalized to their supervisors that they were not at all happy to assume Plaintiff's alcohol service duties for her and Mr.

Aafifi expressly complained that "as the Senior FA, he is requesting assistance with first class, but [Plaintiff] is refusing." (Brown Dep. Attach. 7, PgID 2014.) And importantly Plaintiff's Union representative, Ms. Cooper, conceded that she had received comments from "a few" Flight Attendants regarding Plaintiff's refusal to serve alcohol, some of whom were concerned that it would violate seniority rights and others who indicated they would be willing to work with Plaintiff and serve alcohol for her. (Cooper Dep. 194:19-195:10.) It is clear to the Court that the resolution of Plaintiff's religious accommodation claim will require an interpretation of the seniority provisions of the CBA. This is a determination committed to the RLA arbitral mechanism and the appropriate system board. *See Brotherhood of Locomotive Engineers v. Union Pacific Railroad Co*., 876 F.3d 261, 268 (7th Cir. 2017), *amended on petition for rehearing* 879 F.3d 754 (7th Cir. 2017) ("Wading through the competing declarations to determine the actual authority the Railroad had to modify the disciplinary policies, based on past practices, is a job for the arbitrator.").

To the extent that Plaintiff's requested accommodation results in a violation of the seniority provisions of the CBA, or adversely affects the seniority rights of other Flight Attendants, the "undue hardship" issue, which is a central and dispositive issue on Plaintiff's Title VII failure to accommodate claim, will be conclusively resolved by interpretation of the CBA. Thus, the claim is a minor dispute subject to

adjudication through the RLA arbitration provisions and is therefore preempted/precluded.

### C. Plaintiff Has Failed to Create a Genuine Issue of Material Fact on her Claim of Retaliatory Discharge and Such a Claim In Any Event Also Would Be Preempted/Precluded Under the RLA

"[T]o prevail on a claim for retaliatory discharge under Title VII, a plaintiff must first establish a *prima facie* case by demonstrating that 1) the plaintiff engaged in an activity protected by Title VII; 2) the exercise of the plaintiff's civil rights was known to the defendant; 3) the defendant thereafter undertook an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action." *Virts*, 285 F.3d at 521. "If the plaintiff demonstrates a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Once the defendant articulates its reason, the plaintiff, who bears the burden of persuasion throughout the entire process, must demonstrate that the proffered reason was a mere pretext for discrimination." *Id.* (Internal quotation marks and citation omitted). "The plaintiff may establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; or 3) the stated reason was insufficient to explain the defendant's action." *Id.* "'[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the

reason was false, and that discrimination was the real reason.'" *Id*. (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Plaintiff's retaliation claim is difficult to understand but she reasons as follows: ExpressJet initially accommodated the Plaintiff's request not to serve alcohol through Ms. Brown's advice to Plaintiff shortly before Plaintiff's flight was about to depart on June 2, 2015, to ask her fellow Flight Attendant to perform her alcohol serving duties for her. After taking TOWOP for the holy month of Ramadan, Plaintiff returned to work and apparently operated under that procedure for a period of a few weeks and considered that she had been granted a permanent accommodation not to serve alcohol in her role as an ExpressJet Flight Attendant. ExpressJet disagrees that this was a permanent accommodation, and submits that it was a temporary solution to Plaintiff's then-immediate problem of having to serve alcohol on her upcoming flight and to address Plaintiff's concerns about serving alcohol during the approaching holy month of Ramadan. But this factual dispute is not material because it is undisputed, and ExpressJet does not deny, that ExpressJet did permit Plaintiff to proceed with the swap requests until it received two separate complaints from fellow Flight Attendants who complained that they were being required to perform Plaintiff's alcohol service duties. One of those complaints, the IOR from Ms. Katie Hice, objected to having to perform Plaintiff's alcohol service duties for her but also

contained remarks regarding "books with foreign writings" that Plaintiff was reading and comments on Plaintiff's hijab, that were interpreted by Plaintiff to be bigoted and charged with racial animus toward Plaintiff's Muslim religion. Plaintiff's counsel explained at the hearing on ExpressJet's motion to dismiss the Plaintiff's "theory" of retaliation:

> [T]he revocation of the religious accommodation in response to a colleague's complaints is the factual basis for plaintiff's retaliation claims. The colleague's complaints indicate[s] a level of animus that if ratified by the defendant becomes the basis of the employment action. And here, paragraph 31 of the complaint makes it clear that plaintiff's allegations are that the withdrawl of the religious accommodation was motivated by animus against Miss Stanley because of her faith.

(ECF No. 31, Transcript of May 17, 2017 Hearing 25:22-26:5.) Paragraph 31 of Plaintiff's Complaint alleges: "This revocation of her religious accommodation was purportedly in response to complaints by a flight attendant about the fact that Ms. Stanley wore her hijab; possessed religious books in Arabic ("foreign writings"); and because she did not want to personally serve alcohol." (Compl. ¶ 31.) Plaintiff's counsel stated further at the hearing on the motion to dismiss: "[W]e believe that when we get ahold of their internal records regarding how this religious accommodation was revoked, that will indicate the level of animus that makes the revocation of the religious accommodation independently actionable regardless of whether the accommodation should have been given in the first place." (5/17/17 Hr'g Tr. 32:5-

10.)

Plaintiff's retaliation claim fails for several reasons. First, Plaintiff's retaliation claim is premised on comments made by a fellow Flight Attendant. In constructing her retaliation theory, however, Plaintiff has not identified *her* "protected activity," leaving the Court and ExpressJet to fill in this blank for her. Therefore, Plaintiff fails to create a genuine issue of material fact as to the first element of her *prima facie* case. Second, discovery has simply failed to bear out the factual premise for this claim as Plaintiff has failed to unearth even a scintilla evidence to support the contention that ExpressJet denied Plaintiff's request in response to Ms. Hice's allegedly bigoted remarks, rather than in response to the issues raised by Ms. Hice's and Mr. Aafifi's (the more senior Flight Attendants) complaints about being forced to perform Plaintiff's duties to serve alcohol. The evidence reveals that ExpressJet received two complaints from Flight Attendants in the relatively short period of time (a few weeks) that Plaintiff was operating under the swapping of duties procedure, prompting ExpressJet to investigate the legal and operational implications of granting Plaintiff a permanent guarantee that would relieve her of her alcohol service duties on each of her ExpressJet flights. There is not one piece of evidence from which a reasonable juror could conclude that ExpressJet "ratified" (whatever that might mean in this context – Plaintiff certainly cites no case law explaining such "retaliation by

ratification" theory) Ms. Hice's comments or in any way acted on or even considered Ms. Hice's allegedly bigoted remarks in denying Plaintiff's request that she be relieved of her duties to serve alcohol.  In fact, ExpressJet granted Plaintiff's request to wear her hijab in November, 2013, long before Plaintiff sought an accommodation that would permit her to refuse to serve alcohol to passengers.

And Plaintiff ignores the undisputed fact that ExpressJet had also received and was responding to Mr. Aafifi's complaint, which specifically referenced Plaintiff's refusal to comply with his request, as the senior Flight Attendant in the "A" position, that she assist him with serving alcohol to first class passengers in the pre-departure phase of the flight.   In addition, as discussed *supra*, Plaintiff's Union representative, Ms. Cooper, testified that she received commentes from "a few" Flight Attendants regarding Plaintiff's refusal to serve alcohol, some of whom viewed it as violating seniority rights.  (Cooper Dep. 194:19-195:10.)  Thus, the complaints appear to have been more widespread than just those formally reported to ExpressJet.  There is simply nothing in this summary judgment record, beyond pure speculation, on which a jury could conclude that ExpressJet made the decision to deny Plaintiff's requested accommodation because of Ms. Hice's unsolicited remarks regarding Plaintiff's "foreign reading materials" and her hijab.  Even assuming there is a legal theory that would allow such a "retaliation by ratification" theory to proceed, there is simply no

factual basis for imputing Ms. Hice's allegedly discriminatory remarks to ExpressJet.

Plaintiff has devoted little effort to developing a retaliation argument, and indeed doesn't even endeavor to address the basic elements of the claim. Issues "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Plaintiff "offers no substantive arguments as to the continued viability of a retaliation claim and fails to link any protected activity to any discriminatory conduct." *Dotson*, 52 F. App'x at 660. Plaintiff has failed to create a genuine issue of material fact on her retaliation claim and ExpressJet is entitled to summary judgment on this claim.

ExpressJet reads Plaintiff's retaliation claim more generously, and assumes for sake of argument that the "protected activity" was Plaintiff's request for an accommodation. ExpressJet submits, and the Court agrees, that such a claim also would also be preempted by the RLA because it would require interpretation of the CBA's seniority provisions in analyzing ExpressJet's proffered legitimate, nondiscriminatory reason for refusing to grant Plaintiff's accommodation and placing

her on leave. If the system board were to determine that Plaintiff's requested accommodation would violate the seniority provisions of the CBA, this would be dispositive of any retaliation claim because a "reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Virts*, 285 F.3d at 521. A determination pursuant to the RLA arbitral process that the requested accommodation would in fact violate the CBA would preclude a finding that ExpressJet's proffered reason was false. Accordingly, the retaliation claim could not be decided without interpreting the CBA and an interpretation of the CBA could be dispositive of Plaintiff's retaliation claim, regardless of any evidence of ExpressJet's motive. *See Emswiler*, 691 F.3d at 793. *See also Monroe v. Missouri Pacific R. Co*., 115 F.3d 514, 518 (7th Cir. 1997) (analyzing the "*Hawaiian Airlines-Lingle* preemption standard," and concluding that plaintiff's retaliatory discharge claims were minor disputes involving interpretation of the CBA and required adjudication under the RLA procedures where analysis of those claims "necessarily requires interpretation of the CBA in order to determine the validity of his arguments regarding the Railroad's retaliatory intent").

## IV.   CONCLUSION

Because Plaintiff's failure to accommodate claims are preempted/precluded by the RLA and because Plaintiff fails to create a genuine issue of material fact on her

retaliation claim, which also would be preempted/precluded by the RLA, the Court

GRANTS ExpressJet's Motion for Summary Judgment.

IT IS SO ORDERED.                          s/Paul D. Borman
                                           Paul D. Borman
                                           United States District Judge

Dated: December 7, 2018